# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 10, 2015

## STATE OF TENNESSEE v. TAPO T. TABB AND DOUGLAS INGRAM

### Appeal from the Circuit Court for Williamson County
### No. ICR085137A     Michael Binkley, Judge

---

### No. M2014-00617-CCA-R3-CD – Filed November 13, 2015

---

The Defendant-Appellants, Tapo T. Tabb and Douglas Ingram, were convicted by a Williamson County jury of burglary and theft of property valued over $60,000. The trial court sentenced the Defendants to 12 years' confinement for their burglary convictions and 25 years' confinement for their theft of property convictions, to be served consecutively for effective sentences of 37 years' confinement. On appeal, the Defendants argue that the trial court erred by (1) denying their motion to suppress evidence obtained pursuant to search warrants; (2) failing to instruct the jury on facilitation as a lesser-included offense of burglary; and (3) sentencing the Defendants to 37 years' confinement. In addition, Defendant Ingram argues that his right to a speedy trial was violated. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Benjamin C. Signer, Franklin, Tennessee, for the Defendant-Appellant, Tapo. T. Tabb, Vanessa P. Bryan, District Public Defender, and Susan V. Logan, Assistant Public Defender, Franklin, Tennessee, for the Defendant-Appellant, Douglas Ingram.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Kim Helper, District Attorney General; and Tammy J. Rettig, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On August 9, 2010, the Defendant-Appellants were indicted for burglary and theft of property valued over $60,000 in relation to a burglary and theft that occurred at Lindell Jewelers in Brentwood, Tennessee. Prior to trial, the Defendants moved to suppress

evidence obtained from the search of their residences and a vehicle driven by the Defendants on the night of the offense. On September 11, 2013, the trial court entered an order granting the motion to suppress the evidence obtained from both residences because the State, while not conceding any illegality in the searches, did not oppose the suppression of evidence from the two residences. On September 20, 2013, the State responded to the order granting the motion to suppress and requested a hearing on the matter. The Defendants filed a revised motion to suppress on November 1, 2013, asserting that evidence obtained from the two residences and the vehicle should be suppressed because the search warrants for each were invalid, and a hearing on the matter was held on November 5, 2013.

**Suppression Hearing.** Lieutenant John Wood of the Brentwood Police Department testified that on May 18, 2010, he investigated a burglary and theft that occurred at Lindell Jewelers in Brentwood, Tennessee. Upon arriving at the scene, Lt. Wood observed "multiple jewelry cases that were busted" and "lots of glass on the floor." He contacted the owner of the store, Carolyn Linder, who contacted ADT, the alarm company for Lindell Jewelers. An ADT representative arrived on the scene and retrieved surveillance videos from within the store and provided copies to Lt. Wood. Lieutenant Wood reviewed the surveillance videos and testified that one of the suspect's faces was clearly depicted. At that time, however, he had no leads as to the identity of this suspect. Subsequently, Lt. Wood received information that prior to the burglary, a Franklin police officer conducted a field interview of two individuals in the parking lot of Watson Glen Shopping Center in Franklin, Tennessee. Lieutenant Wood retrieved the names of the individuals and pulled their driver's licenses from the Criminal Justice portal. He "immediately recognized" Defendant Tabb as being one of the individuals observed on the surveillance video. Lieutenant Wood was unable to identify Defendant Ingram based solely on the surveillance video; however, he developed Defendant Ingram as a suspect based upon "the correlation between [Defendant] Tabb and [Defendant] Ingram on the field interview and the close proximity and close time frame between the field interview and the burglary."

After discovering the identity of the two suspects, Lt. Wood learned that the men lived in Memphis, Tennessee, and he contacted the Shelby County Sheriff's Office to assist him in his investigation. A Shelby County detective had recently arrested both suspects in relation to a separate burglary and "immediately recognized" Defendant Tabb on the surveillance video from Lindell Jewelers. As part of his investigation, Lt. Wood was also put in contact with Chad Fussell, a Dickson County Police Department detective, who believed that the same two suspects were involved in a burglary in Dickson County several weeks before the burglary at Lindell Jewelers. Detective Fussell traveled with Lt. Wood to Shelby County to obtain search warrants for the suspects' residences. Upon execution of the search warrants, police found no evidence of a

burglary at Defendant Tabb's residence but found "multiple items of jewelry and watches" at Defendant Ingram's residence that officers believed were connected to the burglary in Dickson County. Search warrants for both residences were introduced into evidence. Lieutenant Wood and Detective Fussell also obtained a search warrant for a blue Ford Expedition believed to have been driven by the Defendants on the night of the offense. Lieutenant Wood received information that the owner of the vehicle was Defendant Ingram's girlfriend, Tynearia Harrison.[1] Police found the vehicle parked at an apartment complex where a relative of Ms. Harrison lived, and upon searching the vehicle, officers recovered multiple items of jewelry, a screwdriver, a black glove, a map of Tennessee, a pair of orange gloves, a pair of blue gloves, and a "crowbar" or "pry bar." Lieutenant Wood agreed that officers did not recover any jewelry from Lindell Jewelers inside of the vehicle.

On cross-examination, Lt. Wood testified that he developed the Defendants as suspects in the burglary "based upon the field interviews . . . and based upon the review of the surveillance cameras within Lindell Jewelers[.]" He recalled that the field interviews occurred approximately 20 to 30 minutes prior to the burglary. The field interview cards provided details about the car driven by the suspects and identifying information about the Defendants, including their names and addresses. Lieutenant Wood testified that Detective Fussell acted as the affiant for the search warrants because Detective Fussell was "certain that these individuals were involved in [the Dickson County] burglary based upon the . . . method that was used, . . . the way they were dressed, and those . . . type[s] of circumstances." Lieutenant Wood obtained search warrants for the Defendants' residences because "in [his] experience . . . , when a burglary or theft happens, there has to be some type of either storage location or area in which . . . items are . . . kept for a while and then sold or gotten rid of somehow." He believed that in this case the "most logical" location for the stolen items to be stored would be at one of the Defendants' residences. Lieutenant Wood recalled that in addition to Detective Fussell, Detective Barry Clark of the Shelby County Sheriff's Office, Detective Drew Hardin of the Memphis Police Department, and Special Agent Tory White of the FBI assisted in the execution of the search warrants.

Following the hearing and arguments by counsel, the trial court took the matter under advisement. The court entered an order on November 13, 2013, denying the Defendants' motion to suppress evidence obtained pursuant to the three search warrants.

---

[1] Ms. Harrison's first name is spelled various ways throughout the record. For consistence, we utilize the spelling used in the search warrant for her Ford Expedition, "Tynearia."

**Trial.** Sergeant Jack Morgan of the Franklin Police Department testified that on May 18, 2010, he was working the night shift from 6:00 p.m. to 6:00 a.m. At approximately 2:47 a.m., he observed a blue Ford Expedition without its headlights on driving slowly through the parking lot of the Watson Glen Shopping Center in Franklin, Tennessee. Sergeant Morgan believed this activity to be suspicious so he initiated a traffic stop of the vehicle and completed field interview cards. He explained that unlike police reports, which report criminal activity, field interview cards are used to "document[] suspicious activity and put[] an individual at a particular place during a particular time." Sergeant Morgan obtained driver's licenses from both the driver and the passenger of the vehicle, later determined to be Defendant Ingram and Defendant Tabb, and ran a records check on both individuals. He recalled that Defendant Ingram was wearing a hoodie and a pair of blue jean shorts, and he had "real distinctive" eyes, which Sergeant Morgan described as "droopy." Defendant Tabb was also wearing a hoodie and had corn rows in his hair. Sergeant Morgan documented the vehicle's make, model, color, license plate number, and VIN number on the field interview card and ran a records check.

On cross-examination, Sergeant Morgan agreed that although there is a clothing description field on the field interview cards, he did not provide a clothing description for the individuals. He explained that he was less concerned with a clothing description because no criminal activity "had actually occurred to [his] knowledge at th[at] point in time" so his main objective was "to provide a name as an investigative lead for anybody should it have occurred or been reported the next day." He agreed that he "could have done a much better job [filling out the field interview cards], but . . . [his] main concern was just documenting the people that [he] made contact with during th[at] time."

Brentwood police officer Brian Kirkpatrick testified that he was dispatched to an alarm call at Lindell Jewelers on May 18, 2010. He arrived at 3:41 a.m. and was the first officer to arrive on the scene. Upon his arrival, he could "immediately see that the front door was open," and as he approached the building he observed pry marks on the front door and broken display cases throughout the store. Officer Kirkpatrick called for backup, and Officer Rob Thomas arrived on the scene and helped "clear the building." The officers did not find anyone inside of the building, and after gathering basic information, they turned the case over to Detective John Wood of the Criminal Investigations Unit.

Tony Myers, a service technician and supervisor for ADS Security, testified that he installed and regularly maintained the security system at Lindell Jewelers. On May 18, 2010, at approximately 4 a.m., he received a call to report to Lindell Jewelers. On the scene, he obtained the surveillance video footage and burned a DVD copy for the police. He explained that the camera system in Lindell Jewelers had nine cameras to capture

- 4 -

different areas of the store and provide different angles. Myers[2] viewed the surveillance video "numerous times" with investigators and testified that he was "absolutely certain" that it was a recording from Lindell Jewelers on May 18, 2010. The video recording was introduced into evidence and played for the jury.

Memphis Police detective James Harden testified that he assisted Lt. Wood in the execution of the search warrant for the Ford Expedition. The vehicle was found at an apartment complex parking lot on Jackson Avenue in Memphis, Tennessee, and was towed to the Memphis Police Department vehicle storage lot, which is fenced and secured with video surveillance. Detective Harden testified that once the vehicle was located and towed, it was "kept secured." On cross-examination, he agreed that the apartment complex parking lot where the vehicle was found was not gated or secured.

Dickson County detective Chad Fussell also assisted in obtaining and executing the search warrants for the Defendants' residences and the Ford Expedition. With regard to the items found inside of the vehicle, Detective Fussell testified that he returned a pair of orange gloves, a pair of blue gloves, a Tennessee state map, and a tire tool to Lt. Wood. On cross-examination, he conceded that he did not know whether the gloves and tire tool recovered from the vehicle were connected with the burglary at Lindell Jewelers. He agreed that officers found no jewelry from Lindell Jewelers inside of the vehicle.

Lieutenant John Wood's testimony was largely consistent with his testimony from the suppression hearing. He described the scene at Lindell Jewelers as "a mess" and recalled that "[g]lass was everywhere." He reviewed the surveillance videos from that night to "see what we were exactly looking at, the methodology of the break-in and who may or may not have been involved." The video depicted two men wearing gray hoodies with one individual wearing a pair of blue gloves and the other individual wearing orange gloves. Lieutenant Wood testified that the video was "pretty good . . . as far as the clarity of it," and that upon viewing it at a slower speed, he was able to "pick up some facial features" of one of the suspects. He initially had no leads as to the identities of the suspects but after learning of the field interviews conducted by Sergeant Morgan, he obtained driver's licenses for the Defendants and "immediately recognized" Defendant Tabb as one of the individuals in the surveillance video. Lieutenant Wood learned that the Defendants lived in Memphis, Tennessee, and with help from officers of the Memphis Police Department, he executed search warrants for the Defendants' residences and the Ford Expedition believed to have been driven by the suspects during the burglary.

---

[2] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Ms. or by his or her proper title.

Officers recovered a pair of blue gloves, a pair of orange gloves, a map of the state of Tennessee, and a "tire tool" from the Expedition, all of which were introduced into evidence.

On cross-examination, Lt. Wood agreed that the search of the vehicle occurred three days after the burglary at Lindell Jewelers and that during that time, he did not know who had possession of the vehicle. He further agreed that officers did not recover any jewelry believed to have been stolen from Lindell Jewelers in either Defendant's home or in the vehicle. He acknowledged that he did not know whether the items found in the vehicle were the same items used to burglarize Lindell Jewelers.

Detective Barry Clark of the Shelby County Sheriff's Office testified that he assisted Lt. Wood in his investigation of the Defendants as it related to the burglary at Lindell Jewelers. Detective Clark testified that he "recognized [Defendant] Tabb as being a citizen of Shelby County," and he was "one hundred percent" certain that the individual in the surveillance video from Lindell Jewelers was Defendant Tabb. He also identified Defendant Tabb in court. Detective Clark testified that he knew Defendant Ingram because he "had a previous occasion to meet him," and he believed the other individual in the surveillance video was Defendant Ingram. In relation to his case, Detective Clark assisted in the arrest of Defendant Ingram at his girlfriend's residence in Memphis, Tennessee. Defendant Ingram's girlfriend gave police consent to search her residence wherein they recovered "a very expensive watch and a receipt with Mr. Ingram's name on the receipt." On cross-examination, Detective Clark agreed that the watch was not stolen property.

Craig Cunningham, the owner of Cunningham's Watch and Jewelry Repair, testified that in 2010, two men came into his store "interested in selling some jewelry[.]" He identified Defendant Tabb in court as one of these two men. He recalled that the men carried the jewelry in a plastic bag and did not say where they had gotten the jewelry. Cunningham was not interested in selling the jewelry in his store but decided to purchase it and send it to a refining company for scrap gold and silver. He agreed to purchase the jewelry in exchange for "somewhere between eight and ten thousand dollars" in cash and a Joe Rodeo watch with diamonds on the face valued at $5,451.58. He provided the sales invoice for the Joe Rodeo watch, which indicated that the watch was sold to "Douglas Ingram" on May 28, 2010. He explained that he did not have the watch in stock so he had to order it and it arrived three to four days later, which is the date indicated on the sales invoice. Cunningham agreed that he did not follow "proper procedure" in terms of logging the jewelry and that instead of keeping the jewelry for 30 days as required by law, he sent it to the refining company the day after purchasing it.

On cross-examination, Cunningham testified that there was nothing suspicious about the transaction he conducted with the Defendants and that the only thing that "stood out" to him was the size of the transaction, which was "one of the larger amounts" he had purchased. He agreed that he had conducted similar transactions "hundreds of times," but he insisted that he was unaware of the law requiring him to keep the jewelry for 30 days. He testified that he did not get into any legal trouble for failing to follow the retention laws in this case.

Randall Marsh, the bookkeeper at Lindell Jewelers, testified that she conducted an inventory of the store after the burglary and submitted it to the police to aid in their investigation. Based on her inventory, a total of $142,698.25 worth of jewelry was stolen from Lindell Jewelers during the burglary, including pieces of Lindell Jewelers' general inventory and pieces on consignment. She also submitted this inventory record to Lindell Jewelers' insurance company, which sent an auditor to independently verify the inventory records and reimbursed Lindell Jewelers in that amount.

Carolyn Linder, the owner of Lindell Jewelers, testified that she did not give anyone permission to enter her store in the early morning hours of May 18, 2010, and she did not give anyone permission to take jewelry from her store.

Robert Duhaime, a retired state police detective sergeant, testified on behalf of the Defendants. He was hired as a private investigator for the Defendants and measured the driving distance from Glen Watson Shopping Center to Lindell Jewelers along various routes. He testified that the route along Interstate 65 was 11 miles, the route along back roads through Brentwood was 12 to 13 miles, and the route along Edmondson Pike was 17 miles. On cross-examination, Duhaime agreed that he did not know which route the Defendants took, the speed at which they traveled, or whether they stopped anywhere in between the two locations on the night of the burglary.

Following deliberations, the jury convicted the Defendants as charged in the indictment of burglary and theft of property valued over $60,000. At the February 10-11, 2014 sentencing hearing, the trial court sentenced the Defendants as career offenders to 12 years for burglary and as persistent offenders to 25 years for theft of property valued over $60,000. The court ordered these sentences to run consecutively for a total effective sentence of 37 years' confinement for each Defendant. Subsequently, both Defendants filed timely motions for new trial. Following a hearing on March 26, 2014, the trial court denied both motions in an order on March 27, 2014.

It is from this order that the Defendants now timely appeal.

## ANALYSIS

On appeal, the Defendants argue that the trial court erred by (1) denying their motions to suppress evidence obtained pursuant to search warrants; (2) failing to instruct the jury on facilitation as a lesser-included offense of burglary; and (3) sentencing the Defendants to 37 years' confinement. In addition, Defendant Ingram argues that his right to a speedy trial was violated.

**I. Motion to Suppress.** The Defendants first argue that the trial court erred in denying their motion to suppress evidence obtained from each of their residences and the vehicle in which they were traveling on the night of the offense. Specifically, they assert that the warrants were too vague in their description of the items to be seized, lacked a sufficient nexus to demonstrate probable cause, and were directed to an officer who lacked authority in Shelby County. The State responds that the trial court properly denied the motion to suppress with regard to all three searches. With regard to the vehicle, the State asserts that the Defendants lack standing to challenge the validity of the warrant as neither had a possessory interest in it. With regard to the Defendants' residences, the State asserts that the searches were lawfully conducted pursuant to valid search warrants. Upon review, we agree that the trial court properly denied the motion to suppress.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial. State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (citing State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998)). "A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing Williams, 185 S.W.3d at 315; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

**A. Standing.** In denying the Defendants' motion to suppress evidence obtained as a result of the search of the blue Ford Expedition, the trial court found that the Defendants failed to establish a reasonable expectation of privacy in the vehicle and thus lacked standing to challenge the search. On appeal, the Defendants do not challenge this finding nor assert that they have standing with regard to the vehicle; instead, they assert that a defendant need not establish standing in order to challenge the facial validity of a search warrant because "whether or not a defendant has a reasonable expectation of privacy in a place to be searched, they are still entitled to due process of law at all stages of the proceedings against them." While novel, we are unpersuaded by this argument.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). Of course, "[n]either the Fourth Amendment nor article 1, section 7 of [the Tennessee Constitution] precludes governmental intrusion absent the reasonable expectation of privacy." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)). The Tennessee Supreme Court has explained,

> An investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion, or a search warrant. The rights assured by the Fourth Amendment are personal rights, and . . . they may be enforced by exclusion only at the instance of one whose own protection was infringed by the search and seizure. The focus of the inquiry is on the extent of a particular defendant's rights under the [constitution], rather than on any theoretically separate, but invariably intertwined concept of standing.

Id. (internal citations and quotation marks omitted); see also State v. Dedrick L. Patton, No. M2007-02492-CCA-R3-CD, 2009 WL 230287, at *3 (Tenn. Crim. App. 2009) ("The determination of 'standing,' . . . does not rely on an inquiry separate or distinct from the determination of whether [a] defendant's Fourth Amendment rights were violated by the law enforcement action.")). Accordingly, a person claiming a Fourth Amendment violation must, as an initial matter, demonstrate a "legitimate expectation of privacy" in the place searched or the thing seized. Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421 (1978); State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991), perm. app. denied (Tenn. 1991). "[W]hen evaluating whether a particular defendant's Fourth Amendment rights have been violated, we look to two inquiries: (1) whether the

individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' and (2) whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable."'" Ross, 49 S.W.3d at 840 (quoting Katz, 389 U.S. at 361) (Harlan, J., concurring)). Failure to establish an expectation of privacy results in a lack of "standing" to challenge the search. See State v. Patterson, 966 S.W.2d 435, 441 n. 5 (Tenn. Crim. App. 1997).

We reject the Defendants' contention that they need not establish standing to challenge the facial validity of a search warrant. An expectation of privacy in the place to be searched is a threshold matter that must be established to raise any sort of Fourth Amendment claim. Without it, the government actor can conduct a search without a showing of reasonable suspicion, probable cause, or a valid warrant. See Talley, 307 S.W.3d at 729. Thus, in order to challenge the search of the vehicle on any Fourth Amendment grounds, the Defendants were required to establish standing. Here, the vehicle was owned by Tynearia Harrison and was found on the premises of an apartment complex where a relative of Ms. Harrison resided. The Defendants did not claim any sort of ownership or possessory interest in the vehicle nor present any other evidence to establish an expectation of privacy in the vehicle. Accordingly, the Defendants do not have standing to challenge the search of the vehicle and the seizure of the items found inside. See Cothran, 115 S.W.3d at 521.

**B. Validity of the Search Warrants.** In addition to challenging the search of the Expedition, the Defendants also challenge the search of their residences. In so doing, they attack the validity of the search warrants on the grounds that the warrants lacked a sufficient nexus to demonstrate probable cause, were too vague in their description of the items to be seized, and were directed to an officer who lacked authority in Shelby County. The trial court denied relief in a detailed order addressing each of the Defendants' claims.

The United States and Tennessee Constitutions state that search warrants shall issue only upon probable cause. U.S. Const. amend. IV; Tenn. Const. Art. 1, section 7. "As a general rule, a search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (quoting State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989)) (citing State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992)). A showing of probable cause generally requires "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Johnson, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993) (citing Lea v. State, 181 S.W.2d 351, 352 (Tenn. 1944)). "In order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that the contraband will be found in the place to be searched pursuant to the warrant." Norris, 47 S.W.3d at 470 (citing

State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981)). A search and seizure may be rendered illegal if the search warrant "was issued on evidence consisting in material part of willful or reckless misrepresentations of the applicant to the issuing magistrate, resulting in a fraudulent procurement[.]" Tenn. R. Crim. P. 41(g)(3).

**Nexus Requirement.** The Defendants first challenge the search warrants on the grounds that they lacked a sufficient nexus between the crime and their respective residences. "To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." State v. Saine, 297 S.W.3d 199, 206 (Tenn. 2009) (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993)). The Tennessee Supreme Court explained that when determining whether a sufficient nexus has been established, reviewing courts should "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" Id. at 206 (quoting Reid, 91 S.W.3d at 275). Where the affidavit contains no direct evidence of such a nexus, we must determine "whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. Id.

"Tennessee law is clear that in determining whether or not probable cause supported issuance of a search warrant only the information contained within the four corners of the affidavit may be considered." Keith, 978 S.W.2d at 870 (citing Jacumin, 778 S.W.2d at 432). An issuing magistrate's finding of probable cause is granted great deference. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)). Accordingly, this court's standard of review is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993) (citing Jacumin, 778 S.W.2d at 431-32).

After our review of the search warrants in this case, we conclude that there was a substantial basis for finding probable cause. The affidavits described the facts of the burglary and provided information linking the Defendants to the burglary. Specifically, the affidavits for each residence issued on May 21, 2010, stated in pertinent part:

> On Tuesday, May 18, 2010[,] a burglary occurred at Lindell Jewelers located at 7028 Church Street East, Brentwood, Tennessee at approximately 0330 a[.]m. Video surveillance at the business captured two individuals wearing light colored hoodies breaking into the business and tak[ing] approximately $140,000 worth of jewelry from display cases. One

of the individuals looked toward a surveillance video and was identified by officers from booking photos and personal knowledge from previous arrests as [Defendant] Tabb who is a resident of Memphis, Tennessee.

Approximately 30 minutes prior to the burglary of the business, a traffic stop of [a] Ford Expedition displaying (TN) 258-RFC was conducted in Franklin, Tennessee where [Defendant] Ingram was identified as the driver with [Defendant] Tabb being a passenger. During the traffic stop, field interview cards were filled out documenting the individuals and personal characteristics. Detective Fussell spoke to the officer that conducted the traffic stop and he advised both individuals were wearing light colored hoodies.

Both affidavits also provided information regarding the current residences of the Defendants in Memphis, Tennessee.

In challenging the search warrants, the Defendants rely on State v. Jason Miller, No. 03C0-9402-CR-00065, 1995 WL 470235 (Tenn. Crim. App. Aug. 9, 1995), in which this court concluded that the search of the defendant's residence for items taken during a home burglary failed to provide a sufficient nexus and thus lacked probable cause. There, the affidavit alleged that the defendant's car was "seen at or near the scene of the burglary," and this car was later seen parked at the defendant's residence. It did not, however, provide any allegation that the defendant was involved in the burglary, that he had placed stolen items in this car, or that he had transported them to his residence. At the suppression hearing, testimony established that a witness had seen a person fitting the defendant's description "loading in speakers" into the car, but this information was not included in the affidavit. On appeal, this court reasoned that "[a]n inference that the defendant, as the burglar of the residence, had stored the items in his residence, may have been permissible under the Smith guidelines"; however, because there was no such information included in the affidavit linking the defendant to the crime, the search warrant lacked probable cause. Id. at *3.

The instant case is easily distinguishable from Jason Miller. Here, the trial court noted that the affidavit described the facts of the burglary and linked the Defendants and the Ford Expedition to the burglary. Regarding the nexus requirement, the court found,

It could be normally inferred, just as explained in State v. Saine, that in this short period, [the] Defendants traveled home to Memphis from Brentwood, and stored the stolen jewelry, which is small, in their homes until they were able to sell it. Although[] the [c]ourt relies only on the four corners of the Affidavit in reaching its conclusion, it does note that Lieutenant Wood's

- 12 -

testimony supports such a basic inference. Just as described by the Court in State v. Saine, the Affidavits in this case properly establish probable cause by showing a nexus among the criminal activity, the place searched, and the items to be seized.

The affidavit set forth both the facts of the offense and how the Defendants were linked to the offense. It described the vehicle driven by the Defendants and provided their addresses in Memphis, Tennessee. As noted, the type of crime, nature of the items, and the normal inferences where a criminal would hide the evidence may establish a sufficient nexus to satisfy probable cause. Smith, 868 S.W.2d at 572. Here, the trial court reasoned that given the time period between the commission of the burglary and the small size of the items of jewelry, it was reasonable to infer that the items would be stored in the Defendants' residences at that time. We agree with the trial court and conclude that the affidavit provided a substantial basis for finding probable case.

**Particularity Requirement.** The Defendants next assert that the search warrants failed to adequately describe the items to be seized. Both the federal and state constitutions require that the search warrant contain a particular description of the items to be seized. Henning, 975 S.W.2d at 296 (citing Marron v. United States, 275 U.S. 192 (1927); Lea, 181 S.W.2d at 351; Hampton v. State, 252 S.W. 1007 (1923)). "This requirement serves as a limitation, both upon government intrusion into a citizen's privacy and property rights and upon the discretion of law enforcement officers conducting the search." Reid, 91 S.W.3d 247, 273 (Tenn. 2002) (citing Henning, 975 S.W.2d at 296). "To satisfy the particularity requirement, a warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Henning, 975 S.W.2d at 296 (internal quotation marks and citations omitted). Thus, while a warrant for "stolen property" would be inadequate, a warrant that employs more specificity such as "stolen stereo players" would be sufficient. See State v. Johnson, 854 S.W.2d at 900 (Tenn. Crim. App. 1993) (citing examples). The Tennessee Supreme Court further explained,

> [W]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

Lea, 181 S.W.2d at 352-53; see also Reid, 91 S.W.3d at 273; Henning, 975 S.W.2d at 296.

Here, the warrants authorized seizure of "evidence of crimes to include stolen property, documents regarding stolen property including sales of stolen property, documentation of the delivery and shipping of stolen property and clothing." The affidavits further describe the property as "$140,000 worth of jewelry from display cases" at Lindell Jewelers. The trial court concluded, and we agree, that this description satisfied the particularity requirement. As in Lea, the purpose of the search was not to find specific property, but to find property of a specific character, i.e., jewelry taken from Lindell Jewelers or evidence of the sale, delivery, or shipping of this stolen property. The warrants did not merely direct officers to seize "stolen property," but rather described the property as "$140,000 worth of jewelry" from Lindell Jewelers. In our view, the warrants described the property with sufficient particularity to "enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." See Henning, 975 S.W.2d at 296; see also Reid, 91 S.W.3d at 273 (warrants describing the property to be seized as items "which may be identified" as property belonging to the victims or the restaurant and items that "may be used to cause the death of the victims" sufficiently described the character of the property, i.e., items taken from the restaurant and the victims and murder weapons).

**Execution of the Warrants.** Finally, the Defendants argue that the search warrants are invalid because they were not directed to an officer with authority in Shelby County but instead were directed to Detective Fussell, a law enforcement officer of Dickson County. As correctly noted by the Defendants, Tennessee Rules of Criminal Procedure 41(c) provides search warrants "shall be directed to and served by: (i) the sheriff or any deputy sheriff of the county where the warrant is issued; or (ii) any constable or any other law enforcement officer with authority in the county." However, contrary to the assertions of the Defendants, the warrants in this case were not directed to Detective Fussell. Indeed, Detective Fussell acted as an affiant for the warrants and assisted in the execution of the warrants, but the warrants were properly directed "to the sheriff, any constable or any peace officer of [Shelby] County." Detective Barry Clark of the Shelby County Sheriff's Office and Detective Drew Hardin of the Memphis Police Department also assisted in the execution of the searches. Nothing about this procedure invalided the search warrants in this case. See State v. Dellinger, 79 S.W.3d 458, 471 (Tenn. 2002) (holding that a Blount County officer's involvement in the execution of a warrant directed to Sevier County officers did not invalidate the search warrant); Smith, 868 S.W.2d at 561 (holding that a warrant directed to Robertson County officers was not invalidated by the participation of a Metropolitan Nashville police officer). The Defendants are not entitled to relief.

**II. Facilitation as a Lesser-Included Offense.** The Defendants argue that the trial court erred by failing to allow the jury to consider facilitation as a lesser-included offense of burglary and theft of property over $60,000. The State responds that the

Defendants waived this issue for failure to request such an instruction in writing at trial and that plain error is not warranted because the evidence does not support such an instruction. We agree with the State that the Defendants are not entitled to relief.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing State v. Rogers, 188 S.W.3d 593, 628-29 (Tenn. 2006); State v. Thacker, No. E2011-02401-CCA-R3-CD, 2012 WL 4078440, at *8 (Tenn. Crim. App. Sept. 18, 2012)).

Both parties agree that facilitation is a lesser-included offense of burglary and theft. See T.C.A. § 40-18-110(f)(2). However, "[t]he mere existence of a lesser offense to a charged offense is not sufficient alone to warrant a charge on that offense." State v. Burns, 6 S.W.3d 453, 468 (Tenn. 1999). After determining that a lesser offense is included in the charged offense, the trial court must then determine whether a charge on the lesser-included is justified by the evidence. Id. at 467. "This second step of the analysis requires a determination that: '(1) reasonable minds could accept the offense as lesser-included; and (2) the evidence is legally sufficient to support a conviction for the lesser-included offense.'" State v. Page, 184 S.W.3d 223, 228 (Tenn. 2006) (citing State v. Wilson, 92 S.W.3d 391, 394 (Tenn. 2002)). In addition, Tennessee Code Annotated section 40-18-110, which governs lesser-included offenses, "places on the defendant the burden of requesting an instruction on any lesser included offense." State v. Fayne, 451 S.W.3d 362, 371 (Tenn. 2014).[3] Code section 40-18-110(c) provides that "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief in a motion for new trial or on appeal." "[I]f a defendant fails to request an instruction on a lesser-included offense in writing at trial, the issue will be waived for purposes of plenary appellate review and cannot be cited as error in a motion for new trial or on appeal." Page, 118 S.W.3d at 229.

Here, the State contends that the Defendants failed to file a written request for a facilitation instruction and thus waived review of the issue. In their briefs to this court,

---

[3] The prior version of Tennessee Code Annotated section 40-18-110(a) placed an affirmative duty on trial courts to instruct on all lesser-included offenses supported by the evidence, whether requested by the defendant or not. However, at the time of the Defendants' trial, the current version, which places the burden on the defendant to request lesser-included offense, was in effect.

the Defendants do not reference the written request and our review of the record reveals no such request. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Accordingly, we conclude that this issue is waived on appeal unless it constitutes plain error. Page, 184 S.W.3d at 230; State v. Henry Wayne Russell, No. M2013-00166-CCA-R3-CD, 2014 WL 1704953, at *24 (Tenn. Crim. App. Apr. 29, 2014); State v. David A. Mantey, No. E2006-00143-CCA-R3-CD, 2008 WL 238446, at *6 (Tenn. Crim. App. Jan. 29, 2008), perm. app. denied (Tenn. Aug. 25, 2008).

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

Here, the record fails to establish the breach of a clear and unequivocal rule of law. As noted, a trial court should only instruct on a lesser-included offense after determining "that the record contains any evidence which reasonable minds could accept as to the lesser included offense." T.C.A. § 40-18-110(a). In making this determination, "the evidence must be viewed liberally in the light most favorable to the existence of the lesser-included offense without making any judgments as to the credibility of such evidence." State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001). The court must also determine "whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense." T.C.A. § 40-18-110(a); Ely 48 S.W.3d at 722 (citing Burns 6 S.W.3d at 469).

As relevant here, "[a] person commits burglary who, without the effective consent of the property owner, . . . [e]nters a building and commits or attempts to commit a theft." T.C.A. § 39-14-402(a)(3). "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a). A person is criminally responsible for a crime committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. 39-11-402(2). On the other hand, "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a). In other words, to convict of facilitation in this case would require proof that Defendant Tabb knew "that another person intended to commit" the crimes of theft and burglary and that he furnished "substantial assistance" to that person, but he did not have "the intent to promote or assist in the commission of the crime or to benefit in the proceeds or results of the offense."

Upon our review, we agree with the trial court that the record contains no evidence that reasonable minds could accept to support an instruction on facilitation. The evidence established that two individuals matching the descriptions of the Defendants entered Lindell Jewelers and stole approximately $140,000 worth of jewelry. Defendant Tabb was positively identified in the surveillance video by police officers as one of the perpetrators. As emphasized by the trial court, there was absolutely no proof to establish a nexus between the Defendants and another unknown individual who participated in the commission of the offense. Further, there was no proof that Defendant Tabb substantially assisted this person in the crimes without the requisite intent for criminal responsibility. In sum, considering the evidence in the light most favorable to the existence of the lesser-included offense, the evidence does not support the notion that Defendant Tabb merely furnished substantial assistance in the commission of burglary and theft without intending

- 17 -

to promote or assist the commission of these offenses. Accordingly, Defendant Tabb is not entitled to relief.

**III. Sentencing.** The Defendants next argue that the trial court abused its discretion in sentencing them to effective sentences of 37 years' confinement. Specifically, they contend that the trial court erred in considering as an enhancement factor that the offense involved more than one victim. In addition, Defendant Ingram asserts that the trial court erred in ordering consecutive sentencing. The State responds that the trial court did not abuse its discretion in sentencing the Defendants. We agree with the State.

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

In sentencing the Defendants, the trial court determined that they were both persistent offenders for the Class B felony offense of theft of property over $60,000 and career offenders for the Class D felony offense of burglary.[4] As enhancement, the court considered enhancement factor one, that each Defendant had a previous history of criminal convictions in addition to those necessary to establish the range; enhancement factor three, that the offense involved more than one victim; enhancement factor six, that the amount of damage to the property taken from the victim was particularly great; and enhancement factor 24, that the offense involved theft of property resulting in significant damage to other property belonging to the victim or for which the victim was responsible. See T.C.A. § 40-35-114(1), (3), (6), (24). In addition, the court considered enhancement factor eight, that the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, applicable to Defendant Tabb. Id. § 40-35-114(8).

Additionally, the court noted the purposes and principles of the sentencing act. Specifically, the court found that confinement was necessary to protect society from a defendant whose criminal history is lengthy, stating, "society needs to be protected from one who in my opinion based upon the record and the facts in this case has made his living essentially stealing from other people, selling property, and then trying to live off the cash from that property." The court also found that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrent to others. Based on these findings, the court sentenced the Defendants to the mandatory 12 years' confinement as career offenders for the Class D burglary offense and 25 years' confinement for the Class B theft offense. With regard to consecutive sentencing, the trial court found factor number two, that the defendant is an offender whose record of criminal activity is extensive, applicable to both defendants. The court ordered each Defendant's sentences to run consecutive for a total effective sentence of 37 years' confinement.

---

[4] The presentence reports reflect that Defendant Ingram had 15 prior felony convictions and Defendant Tabb had 24 prior felony convictions.

**A. Multiple Victims Enhancement Factor.**  In challenging the length of their sentences, the Defendants assert that the trial court erroneously applied enhancement factor number three, that the crime involved more than one victim.  See T.C.A. § 40-35-114(3).  For purposes of this enhancement factor, a victim "'is a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime.'"  State v. Cowan, 46 S.W.3d 227, 235 (Tenn. Crim. App. 2000) (quoting State v. Raines, 882 S.W.3d 376, 384 (Tenn. Crim. App. 1994)).

Here, the Defendants were only convicted of one count of theft of property over $60,000 from Lindell Jewelers; however, the trial court found the multiple victims enhancement factor applicable given the fact some of the property stolen from Lindell Jewelers was property owned by other individuals there on consignment.  The court explained that the consignors transferred this property "at a minimum as a bailment" with the expectation that they would receive compensation after the property sold, but "[t]itle was never given up."  The record supports this finding and the trial court's application of this enhancement factor.  See State v. Robert Dennis Heisinger, No. M2002-01217-CCA-R3-CD, 2004 WL 508490, at *3 (Tenn. Crim. App. Mar. 16, 2004) (multiple victim factor applicable where only one victim was named in the indictment but the evidence established that the property stolen was the common property of the named victim and her husband).

Notwithstanding, we note that the misapplication of this enhancement factor does not remove the presumption of reasonableness of the imposed sentences.  See Bise, 380 S.W.3d at 706 (holding that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005.").  Because the statutory enhancement and mitigating factors are advisory only, and because "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion[,]" we conclude that the trial court did not err in its sentencing determinations where the record otherwise supports the within-range sentences imposed.  See T.C.A. § 40-35-114(c)(2) (2010); Carter, 254 S.W.3d at 345.  The Defendants are not entitled to relief.

**B. Consecutive Sentencing.**  In addition, Defendant Ingram challenges the trial court's imposition of consecutive sentencing.  On appeal, Defendant Ingram acknowledges his extensive criminal history but argues that the purposes and principles of sentencing are not served by imposing such a lengthy sentence.  Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively.  T.C.A. § 40-35-115(a) (2006).  The Tennessee Supreme Court has held, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations."  State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013).  A trial court may order multiple

offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). T.C.A. § 40-35-115(b). "[T]he existence of any one of the seven criteria in Tennessee Code Annotated section 40-35-115(b) is sufficient to justify consecutive sentencing." State v. David Wayne Phillips, No. M2011-01920-CCA-R3-CD, 2012 WL 2870597, at *8 (Tenn. Crim. App. July 13, 2012) (citing State v. Adler, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001)). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Pollard, 432 S.W.3d at 861. An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

In the instant case, the trial court imposed consecutive sentencing upon finding that both Defendants had extensive criminal records. Indeed, the presentence report reflects that Defendant Ingram's criminal record began at age 18 and includes 15 felony convictions and numerous misdemeanor convictions. This court has held that "an extensive criminal history, standing alone, is enough to justify the imposition of consecutive sentencing." State v. Nelson, 275 S.W.3d 851, 870 (Tenn. Crim. App. 2008) (citing State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997)); see also State v. Christman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994). The record supports the trial court's conclusion that the Defendant's criminal history is extensive, and the court's use of this factor as a basis to impose consecutive sentencing is both proper and alone sufficient to justify consecutive sentencing. See Adams, 973 S.W.2d at 231. Accordingly, we discern no abuse of discretion by the trial court. Defendant Ingram is not entitled to relief.

**IV. Speedy Trial Violation.** Finally, Defendant Ingram argues that his case should be dismissed because his right to a speedy trial was violated. He asserts that the delay of a little over three years caused him to suffer oppressive pretrial incarceration and unduly prejudiced his defense. The State responds that Defendant Ingram has failed to establish a speedy trial violation and that the trial court properly denied relief. We agree with the State.

Defendant Ingram was indicted on August 9, 2010 by the Williamson County Grand Jury and arrested on September 30, 2011, on those charges. Trial was originally set for January 30, 2013, but Defendant Ingram's counsel requested a continuance, and the matter was set for April 24, 2013. On April 8, 2013, the State filed a motion to

- 21 -

continue. On April 9, 2013, Defendant Ingram filed a response in opposition to the continuance and asserted his right to a speedy trial.

At a hearing on the matter, the State explained that the request for a continuance was due to its desire to try the Defendants together in a joint trial. The State further explained that Defendant Tabb had been arrested and placed in custody in another county, requiring the State to request a transport to Williamson County. The State located Defendant Tabb at a facility in Madison County and requested that a hold be placed on him in June 2012, at which point Defendant Ingram's trial date had not yet been set. In July 2012, Defendant Ingram's trial was set for January 2013. The State acknowledged that it should have requested a transport of Defendant Tabb at that time, but due to "an oversight" by the State, the request was not made. Subsequently, Defendant Ingram requested a continuance, which the State did not oppose, and the State requested a transport for Defendant Tabb "within that same week[.]" Despite these efforts, Defendant Tabb was not arraigned in Williamson County until March 2013, and the trial was set for April 2013. Consequently, the State requested a short continuance in order to proceed to trial against both Defendants. Counsel for Defendant Ingram informed the court that Defendant Ingram was not requesting that the case be dismissed "at this point," but he opposed the State's motion to continue and asked that the trial begin as scheduled. Counsel asked the court to be mindful of how long Defendant Ingram had been incarcerated, which was 19 months at the time of the hearing.

Following the hearing, the trial court made extensive oral findings and conclusions regarding the speedy trial violation. In conducting its analysis, the court acknowledged that the length of the delay exceeded one year, triggering the need for further inquiry, but found that the delay was not yet "presumptively prejudicial" based on the circumstances of the case. The court noted that "the reasonableness of the length of the delay depends on the complexity of the case" and found that this case did not involve "an ordinary street crime." Regarding the reason for the delay, the court found that they were "good, solid, procedural reasons that [were] reasonable under all the circumstances" and "should not weigh heavily against the State." The court found nothing in the record to indicate "an intentional delay to gain a tactical advantage" or "bureaucratic indifference or negligence." The court noted that "both sides have asked for this case to be continued" and that the reasons for the delay should "not be weighed against either [Defendant Ingram] or the State." The court stated that the "most important factor" in a speedy trial analysis is prejudice to the defendant but found that this factor did not weigh heavily in favor of Defendant Ingram. The court acknowledged that Defendant Ingram may have suffered some additional anxiety and concern about the case due to the delay but gave this factor little weight. Likewise, the court found that Defendant Ingram failed to establish any impairment of his defense due to the delay. Accordingly, the court granted the State's motion for a continuance and set out the same in an order dated April 25,

2013.  In the order, the court ordered the parties to pick a mutually agreeable date, and the parties settled on August 28, 2013.

On August 28, 2013, the trial court, sua sponte, continued the trial a third time because Defendant Tabb was not present.  The court stated that while both the State and Defendant Ingram believed that Defendant Ingram's trial could proceed, the case could not go forward because "[t]hese cases are still together."  Defendant Ingram's counsel objected to the continuance and claimed that the prosecutor had agreed to sever the case.  She further asserted a speedy trial claim on behalf of Defendant Ingram and argued that his right to a speedy trial justified severance.  The court responded, "[t]he [c]ourt speaks through its orders and its pleadings" and "there was no motion filed, no order entered, no discussion with the court about the severance of this case."  The court ordered that a joint trial begin on November 20, 2013.

On November 1, 2013, Defendant Ingram moved to dismiss the case due to a violation of his right to a speedy trial, and a hearing on the matter was held on November 5, 2013.  Counsel for Defendant Ingram noted that Defendant Ingram had been incarcerated for more than two years and argued that this extensive delay had caused him "suffering from anxiety" and prejudiced his defense.  The State responded that the most recent continuance, which was less than 60 days, should not be weighed against the State as it was the result of Defendant Tabb not being transported and a number of late-filed motions by Defendant Ingram.  The trial court took the matter under advisement and entered an order denying the motion to dismiss on November 13, 2013.  A joint trial proceeded as scheduled on November 20, 2013, and the Defendants were convicted on November 22, 2013.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial.  See U.S. Const. amend VI; Tenn. Const. art. 1, § 9.  The right to a speedy trial is also statutorily protected in Tennessee.  See T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel.").  In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial.  Tenn. R. Crim. P. 48(b).  "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished."  State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury.  State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn.

2001) (citing Utley, 956 S.W.2d at 491).  When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972); see also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee).  The Barker factors are:  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay.  Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759.  "The factors relevant to a speedy trial inquiry are interrelated and depend upon the particular circumstances of each case."  Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis.").  If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83.  We review a trial court's determination of whether a defendant's right to a speedy trial was violated under an abuse of discretion standard.  State v. Hudgins, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)); State v. Easterly, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001); State v. Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *10 (Tenn. Crim. App. Aug. 26, 2013), perm. app. denied (Tenn. Dec. 11, 2013).

**A. Length of Delay.**  We first consider the length of the delay.  The Tennessee Supreme Court has held that "either a formal indictment or information or else the actual restraint imposed by arrest and holding to answer a criminal charge" triggers the speedy trial analysis.  Utley, 956 S.W.2d at 492 (quoting State v. Wood, 924 S.W.2d 342, 345 (Tenn. 1996)); see also State v. Baker, 614 S.W.2d 352, 354 (Tenn. 1981) (holding that "no speedy trial rights arise until after formal accusation, either by arrest or by grand jury action.").  A post-accusation delay of one year or more is "presumptively prejudicial" and will trigger a speedy trial inquiry.  Utley, 956 S.W.2d at 494.  "The reasonableness of the length of the delay depends on the complexity of the case."  Wood, 924 S.W.2d at 346. "[D]elay that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge."  Easterly, 77 S.W.3d at 235 (quoting Barker, 407 U.S. at 530-31).  However, the presumption that the delay has prejudiced the defendant intensifies over time.  Simmons, 54 S.W.3d at 759 (citing Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494; Wood, 924 S.W.2d at 346).

Here, Defendant Ingram was indicted on August 9, 2010, and arrested a little over a year later in September 2011.  The reason for the delay between Defendant Ingram's indictment and arrest is not borne out by the record.  In July 2012, Defendant Ingram's trial was scheduled to begin on January 30, 2013, but was continued to April 24, 2013, after a request by Defendant Ingram.  After two more continuances, one which was requested by the State and one which was ordered sua sponte by the trial court, the matter

proceeded to trial on November 20, 2013. As acknowledged by the trial court, a post-accusation delay of three years and three months warranted a speedy trial inquiry. However, the delay was not necessarily unreasonable when compared to other cases. See Simmons, 54 S.W.3d at 759 (approximate twenty-three-month delay between the return of the indictment and the defendant's arrest was not unreasonable); Wood, 924 S.W.2d at 346 (delay of thirteen years did not violate right to speedy trial); Bishop, 493 S.W.2d at 84–85 (delay of two years supported defendant's speedy trial claim but "[wa]s not per se extreme"); Barker, 407 U.S. at 533-36 (five-year delay between arrest and trial did not violate right to speedy trial). Further, this case involved complex felony charges against two defendants. It involved numerous pre-trial motions, continuance requests by both the State and Defendant Ingram, and coordination with other counties to secure transportation of Defendant Tabb for trial. In our view, the length of the delay, while extensive, weighs against the State but not heavily.

**B. Reason for Delay.** The next factor to consider is the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47; see also Simmons, 54 S.W.3d at 759. Deliberate delay is weighed heavily against the State. Negligent delay is also weighed against the State, but less heavily than intentional delay. Delay necessary for effective prosecution, such as locating a missing witness, is considered valid and not weighed against either party. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d at 346-47; see also Barker, 407 U.S. at 531.

Here, Defendant Ingram requested the first continuance, resulting in a delay of his trial from January 30, 2013, to April 24, 2013. The State then requested a continuance in April 2013 in order to try the Defendants jointly, and trial was reset for August 28, 2013. The trial court, sua sponte, ordered a third continuance from August 28, 2013, until November 20, 2013, because Defendant Tabb was not transported for trial. Although the State did not request the final continuance, we must attribute the failure to procure Defendant Tabb at trial to the State and conclude that the seven-month delay from April 2013 to November 2013 resulted from a lack of due diligence by the State. We note, however, that Defendant Ingram failed to properly request a severance in order to proceed without Defendant Tabb; thus, the final delay can be attributed, albeit slightly, to Defendant Ingram. Nevertheless, it is the duty of the State, not the accused, to bring the matter to trial. See Simmons, 54 S.W.3d at 759-60 (quoting Barker, 407 U.S. at 527). Thus, this factor weighs against the State, although not heavily because there is no evidence of intentional delay to gain a tactical advantage.

- 25 -

**C. Assertion of Right.**    The third factor to evaluate is whether the accused asserted the right to a speedy trial.  Assertion of the right weighs strongly in favor of the defendant, while failure to assert the right will make it difficult to prove that the right has been denied.  Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 53132).  Here, the Defendant formally asserted his right to a speedy trial on April 9, 2013, over two years after his indictment.  His trial began seven months later in November 2013.  While this factor weighs in favor of the Defendant, it does not weigh heavily in his favor.  See Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *12 (Tenn. Crim. App. Aug. 26, 2013) ("[T]his factor weighs in the defendant's favor.  However, the delay prior to the defendant's filing this motion was necessary, rational, and, in some regards, attributable to the defendant.  Moreover, once the trial court heard the defendant's motion, it ruled that the defendant's case would be heard at its next trial date and the case commenced as scheduled within five months of the hearing.").

**D. Prejudice from Delay.**    The final factor, the prejudice to the accused caused by the delay, is the most important to consider in the speedy trial inquiry.  Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 532; Wood, 924 S.W.2d at 348; Bishop, 493 S.W.2d at 85).  The prejudice factor is assessed in light of the interests that the right to speedy trial is designed to protect.  Barker, 407 U.S. at 532 (identifying three interests of the accused:  "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."); see also Simmons, 54 S.W.3d at 760 (citing Bishop, 493 S.W.2d at 85).  The Tennessee Supreme Court has observed that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense."  Berry, 141 S.W.3d at 568 (citing Baker, 614 S.W.2d at 356); see also Barker, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.").  "Faded memories, erosion or loss of potentially exculpatory evidence, and loss of potentially favorable witnesses are all possible results of a lengthy delay."  Wood, 924 S.W.2d at 346.

Courts have recognized the difficulty in establishing impairment to the defense and have held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim."  See Doggett, 505 U.S. at 654-55 (finding delay of eight-and-a-half years between indictment and arrest caused by government's negligence to be "excessive" and a violation of defendant's speedy trial rights though defendant could not demonstrate specific prejudice).  Nevertheless, in the majority of cases, "courts will still look for a demonstration of actual prejudice."  Easterly, 77 S.W.3d at 238; Wood, 924 S.W.2d at 348; State v. Roger David Browder, No. 02C01-9606-GS-00201, 1998 WL 47877 (Tenn. Crim. App., Feb. 9, 1998) ("[E]ven though affirmative proof of particularized prejudice is not essential to every speedy trial claim, . . . we find it difficult to evaluate the degree to which the delay prejudiced the defendant absent some specific

information about the deprivations which he incurred."), perm. app. denied (Tenn. Oct. 19, 1998).

Here, Defendant Ingram argues that the more than three years' delay in his case caused prejudice to him by impairing his defense. Specifically, he asserts that his memory diminished over time, impeding his ability to recall "details and events, particularly, his whereabouts [on the night of the offenses] in order to establish an alibi defense." Despite these assertions on appeal, we agree with the trial court that Defendant Ingram failed to establish any such prejudice. See, e.g., Berry, 141 S.W.3d at 569 ("The bare allegation that the delay affected [the defendant's] ability to prepare a defense is unsupported by any specific examples."). While Defendant Ingram argues that his diminished memory hindered his ability to present an alibi defense, there is nothing further in the record to support this claim or suggest that he intended to present such a defense at trial. Further, he did not assert or establish that he was unable to present any witnesses due to the delay in the proceedings. Finally, although he argues that he was prejudiced by the joint trial with Defendant Tabb as his identification was "more in doubt that that of [Defendant] Tabb," such prejudice is of no concern in determining whether a defendant's speedy trial right was violated. Based on the record, we cannot conclude that Defendant Ingram's ability to prepare a defense was impeded by the delay.

Defendant Ingram also argues that the delay was oppressive and caused him anxiety as he awaited trial on serious charges. He claims that the pretrial incarceration imposed "undue stressors involving isolation, separation from and concerns for his family's welfare [and] finances," and "mounting anxiety regarding the outcome of the case." The trial court acknowledged that Defendant Ingram likely suffered some increased anxiety due to the delay in the proceedings but found that given his extensive criminal history and experience with the criminal justice system, this factor should not weigh heavily against the State. We, too, acknowledge the lengthy pretrial incarceration faced by Defendant Ingram and the likely increased anxiety that resulted. Nevertheless, we cannot conclude that any anxiety suffered by him was so great as to outweigh the other factors in the analysis.

After applying the Barker balancing test, we conclude that the Defendant's right to a speedy trial was not violated. As we have previously noted, the factors are interrelated and depend on the particular circumstances of the case. We cannot ignore that Defendant Ingram requested the initial continuance in January 2013 and first asserted his speedy trial right in April 2013, over two years after his indictment. Trial proceeded against Defendant Ingram seven months later. While the lack of due diligence by the State was not appropriate, we conclude that the delay in the proceedings was not unreasonable given the complexity and seriousness of the case. Further, the Defendant failed to establish any prejudice to his defense as a result of the delay. Accordingly, the

- 27 -

Defendant has failed to established a speedy trial violation, and the trial court did not abuse its discretion in denying the Defendant's motion to dismiss.

Finally, we briefly address Defendant Ingram's contention, couched within his argument regarding his right to a speedy trial, that the trial court erred in sua sponte ordering a continuance on August 28, 2013. The granting of a continuance lies within the sound discretion of the trial court, and this court will not reverse a decision regarding a continuance unless the trial court abused its discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing Odom, 137 S.W.3d at 589). Here, the trial court determined that the trial could not proceed as scheduled because Defendant Tabb was not present. Although Defendant Ingram claimed that the State had agreed to proceed with its case against Defendant Ingram only, there was nothing in the record to support this assertion or indicate that a severance had been granted by the trial court. Accordingly, we discern no abuse of discretion by the trial court.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE